30 A.3d 291

BALTIMORE COUNTY, Maryland

v.

Virginia W. BARNHART.

No. 1196, Sept. Term, 2010.

Court of Special Appeals of Maryland.

Oct. 27, 2011.

---

Jennifer R. Frankovich (Michael E. Field, Co. Atty., on the brief), Towson, MD, for Appellant.

James E. Dickerman (Alvin I. Frederick, Eccleston & Wolf, PC, on the brief), Hanover, MD, for Appellee.

Panel: DEBORAH S. EYLER, WATTS, and JAMES P. SALMON, (Retired, Specially Assigned), JJ.

WATTS, J.

This is an appeal from a grant of summary judgment by the Circuit Court for Baltimore County in an action for declaratory judgment brought by Baltimore County, Maryland (the "County"), appellant, against Virginia W. Barnhart, appellee. The County sought a ruling as to whether appellee, the former County Attorney, violated the Maryland Lawyers' Rules of

Professional Conduct ("MLRPC") by providing legal representation to David Willis, Jr. ("Willis"), a former County employee, in an administrative appeal of the County's calculation of his retirement benefits, and sought to have appellee disqualified from representing Willis. The circuit court granted summary judgment in favor of appellee. The County appealed and presented one question, containing multiple parts, which we rephrased into four questions, as follows: [1]

I. Did the circuit court err in finding that there was no genuine dispute of material fact as to whether appellee violated MLRPC 1.9 and 1.11, and thereby in granting summary judgment?

II. Did the circuit court err in finding that the County waived its right to request disqualification of appellee from representing Willis in the administrative appeal?

III. Did the circuit court err in finding that it did not have jurisdiction to rule on whether appellee violated MLRPC 1.9 and 1.11?

IV. Did the circuit court err in finding that declaratory judgment was an inappropriate vehicle for determining whether appellee violated MLRPC 1.9 and 1.11? [2]

We answer the first three questions in the negative, and therefore shall affirm.

---

**1.** The County phrased the question thus:

I. Did the Circuit Court for Baltimore County improperly grant summary judgment in favor of Ms. Barnhart when Baltimore County clearly established that: (1) multiple issues of material fact exist; (2) the County did not waive their right to raise Ms. Barnhart's conflict of interest; (3) jurisdiction is appropriate; and (4) there is a justiciable issue.

**2.** The County argues that the request for a declaratory judgment in the circuit court was the appropriate method for determining whether appellee violated MLRPC 1.9 and 1.11 and for resolving the issue of her disqualification. Because we conclude that the circuit court properly determined that it lacked jurisdiction to rule as to whether appellee's conduct violated the MLRPC, as explained *infra* Discussion III, we need not address this issue.

## FACTUAL AND PROCEDURAL BACKGROUND

Between May 1995, and 2001, appellee was the County Attorney for Baltimore County. In that capacity, appellee represented the County's Employee Retirement System ("ERS"), an agency of the County government that provides pension benefits to retirees.

### Rowe Appeal

In March 2007, appellee notified the County that she intended to provide legal representation to a retiring County employee, Brian J. Rowe, in an administrative appeal contesting the calculation of his retirement benefits. Rowe accrued service time as a member of a noncontributory pension benefit system prior to joining the County. The County utilizes a contributory pension benefit system.[3] Md.Code (2002) § 37–203(f)(2) of the State Personnel and Pensions Article ("SPP"), effective during Rowe's appeal, provided that:

> [I]f an individual transfers from a noncontributory system to a contributory system, on retirement the individual's retirement allowance shall be reduced by the actuarial equivalent of the accumulated contributions that would have been deducted if the individual had earned the transferred service credit under the new system, including interest on those contributions.

The interest rate used to calculate Rowe's pension reduction was at issue in the appeal. The County used the interest rate of 7.875%, compounded monthly, known as the "valuation rate," and Rowe contended that the County should have used the interest rate of 5%, compounded yearly, known as the "regular rate."[4]

---

3. "A 'non-contributory' pension is one funded solely by an employer. A 'contributory' pension requires payments by the employee, usually by payroll deductions." *Lookingbill v. Lookingbill,* 301 Md. 283, 285, 483 A.2d 1 (1984) (citation omitted).

4. SPP § 37–203(f)(2) was amended in 2007 to specify that the "regular" interest rate should be used to calculate the reduction on transferred contributions.

Prior to the enactment of SPP § 37–203, and its predecessors, there was no accepted state-wide policy or procedure governing how to handle the transfer of credit between the systems.[5] In 1990, the County worked with an outside consultant and the County's Office of Law to "formulate[ ] a proposed transfer system policy designed to address the question of how the new State requirements [would] be implemented administratively." As a result, the ERS adopted the Transfer Policy,[6] which provided that the County was to calculate pension reductions using the valuation rate. In a memorandum, titled "Implementation of System [T]ransfer [P]olicy," dated November 28, 1990, the County's Office of Law stated: "It is the formal opinion of the Office of Law that [the] proposed system transfer policy, as amended, parallels the actual language of the new legislative enactments and thus[,] constitutes a legally tenable way of administering these new state mandates." Notwithstanding the adoption of the Transfer Policy, the County, in practice, used the regular rate of interest to calculate the reduction of transferred benefits.

In 1998, during appellee's tenure as County Attorney, Rowe, then the Baltimore County Auditor, undertook an audit of the ERS and issued a report to County officials and the general

---

5. The transfer of pension credit was originally addressed in 1981, in Chapter 394 of the Laws of Maryland, and codified at Article 73B, § 32(c) of the Annotated Code of Maryland. It provided in pertinent part: "Upon retirement, the member's retirement allowance shall be reduced by the actuarial equivalent of the accumulated contributions with interest that have not been deducted." In 1993 and 1994, the statute was recodified as SPP § 37–203(f)(2), when SPP was codified, and provided:

Except as provided in § 37–204 of this subtitle, if an individual transfers from a noncontributory system to a contributory system, on retirement the individual's retirement allowance shall be reduced by the actuarial equivalent of the accumulated contributions that would have been deducted if the individual had earned the transferred service credit under the new system, including interest on those contributions.

6. The Board of Trustees adopted the retirement system Transfer Policy, effective January 1, 1991, which provides that a contribution deficiency shall be determined for members who transfer to the County from a non-contributory retirement/pension system.

public. In a final audit report dated June 9, 1998, Rowe advised the County that continuing to calculate benefit reductions with the regular interest rate, "could result in significantly lower contribution deficiencies than required by the Board's policy, resulting in higher benefit payments to the member." Rowe recommended in the final audit report that the County follow the Transfer Policy as endorsed by the November 28, 1990, memorandum, and calculate transferred benefits using the valuation interest rate. After the June 9, 1998, final audit report was released, Rowe had sought "another calculation of his deficiency to determine whether or not the County was complying with State law as he saw it," which irrespective of his recommendation in the final audit report, Rowe believed required use of the regular interest rate. The County's Office of Law responded in a memorandum, dated January 16, 2003, to Rowe's contention, stating that "[t]he law [as it was then constructed] provides no interest rate or standards for determining the interest rate. Accordingly, the General Assembly can be assumed to have left those decisions to the ERS."

Rowe's retirement was to be effective April 1, 2007. On February 21, 2007, Rowe was provided an estimated calculation of his retirement benefits. Rowe's retirement benefits were calculated using the valuation rate. On March 23, 2007, Rowe, represented by appellee, noted an appeal of the calculation of his retirement benefits to the Board of Appeals (the "Board"). The Board held a hearing on Rowe's appeal on November 28, 2007, and February 12, 2008. At the hearing, Rowe testified that he accepted the position of County Auditor in 1995, upon representations made to him that the value of his unpaid pension contributions would be calculated using the regular interest rate of 5%.

On June 3, 2008, following Rowe's hearing, the Board issued an opinion finding in favor of Rowe and ordering the County to recalculate Rowe's retirement benefits using the regular interest rate. In its opinion and order, the Board reviewed the statutory history of SPP § 37–203(f)(2) and opinions by the Attorney General and County Attorney's Office interpret-

ing SPP § 37–203(f)(2). The Board noted that on April 17, 2007, Senate Bill 583, entitled "Alternative Contributory Pension Selection—Clarifications" passed and that Bill 583 amended SPP § 37–203(f)(2) to provide:

> Except as provided in § 37–204 of this subtitle, if an individual transfers from a noncontributory system to a contributory system, on retirement the individual's retirement allowance shall be reduced by the actuarial equivalent of the member contributions that would have been deducted if the individual had earned the transferred service credit under the new system, including regular interest on those contributions.

The Board concluded that this "means that the legislature was clarifying its intention with respect to each section set forth in the Bill, including SPP § 37–203(f)(2). The intention has always been to utilize [the] regular interest [rate] in the computation of the reduction." The County filed a Motion for Reconsideration, which was denied by the Board on September 10, 2008. On October 1, 2008, the County petitioned for judicial review in the Circuit Court for Baltimore County.[7]

### Willis Appeal

On August 2, 2008, Willis retired from employment with the County. Prior to his employment with the County, Willis worked for the State of Maryland, which utilizes a noncontributory pension benefit plan. Willis disagreed with the County's use of the valuation rate in calculating his retirement benefits and hired appellee to represent him in contesting the calculation. On August 13, 2008, appellee noted an appeal on behalf of Willis to the Board. Appellee, in the scope of her representation of Rowe and Willis in their appeals, sent letters to the County dated August 18, 2008, and October 22, 2008, in which she demanded correction of the County's calculation of retirement benefits on behalf of Rowe, Willis, "and all others similarly situated past and future retirees who transferred

---

7. The record in this case does not indicate how the circuit court resolved the County's Petition for Judicial Review.

service credit from a noncontributory system to the County Retirement System." In the letters, appellee stated an intention to initiate a class-action lawsuit if the County did not comply.

In a letter dated November 5, 2008, to appellee, the County for the first time raised an issue as to the propriety of appellee's representation of County retirees. The County claimed the existence of a conflict of interest due to appellee's prior representation of the ERS during her tenure as the County Attorney. In a letter to the County dated November 14, 2008, appellee responded that the County's position was factually and legally incorrect. In the letter, appellee stated that she had "never participated personally and/or substantially in the matter at issue in Mr. Rowe's or Mr. Willis' appeals" and accused the County of raising the contention for tactical reasons. On January 20, 2009, appellee sent an e-mail to the County stating: "Having not received any motion to disqualify me from representing Mr. Willis in his Board of Appeals hearing next week I assume that you have reconsidered and that you will not be seeking my disqualification[.]"

On January 21, 2009, six days before Willis' scheduled hearing before the Board,[8] the County filed a Verified Complaint for Declaratory Judgment in the Circuit Court for Baltimore County, seeking that the circuit court find that: (1) appellee violated MLRPC 1.9 and 1.11 by accepting representation of Willis in a matter in which "she 'participated personally and substantially' during her tenure as County Attorney for Baltimore County, Maryland from 1995–2001," and (2) appellee violated MLRPC 1.9 and 1.11 when she failed to request and obtain, pursuant to those Rules, informed consent for her representation of Willis from the County. On February 26, 2009, appellee filed a Motion to Dismiss the Complaint. On April 30, 2009, a circuit court judge, in a document titled "Memorandum to the File," stated: "The Declaratory Judg-

---

**8.** A County Board of Appeals of Baltimore County Notice of Assignment dated October 1, 2008, reflects that an evidentiary hearing on the appeal was scheduled for January 27, 2009.

ment Complaint is to no purpose because it asks for no relief that this court can or should grant in a specific case. Therefore, it should be dismissed. I would make a Declaration that I cannot grant the relief requested because it is to no purpose discernable to me." The circuit court judge stated: "If Baltimore County is asking that [appellee] be disqualified from representing a client in an administrative proceeding that is working itself through the system . . . because of a violation of the Rules of Professional Conduct, then Baltimore County can amend its complaint in this case to ask for that relief."

On June 9, 2009, the County filed an Amended Verified Complaint for Declaratory Judgment, which repeated the two requests for relief in the original Complaint, and added a third request for declaratory judgment, seeking that appellee be disqualified from representing Willis in his administrative appeal. In the Amended Complaint, the County alleged that "[i]n her position as County Attorney, [appellee] knew or should have known that the Office of Law participated in the drafting of the Transfer Policy and a formal opinion, which concluded that the policy was in compliance with applicable State and county law." The County alleged that "[a]s County Attorney, [appellee] was in the position to receive significant attorney-client confidences relating to the ERS and specifically, the issues related to this matter. Such confidences could have been conveyed during casual conversations with various County officials, employees and departments." The County alleged that "[o]ne of the matters that [appellee] was privy to included" Rowe's 1998 audit of the ERS. The County alleged that the findings of Rowe's 1998 audit "form the basis for Mr. Willis' challenge to the calculation of his retirement benefits."

In the Amended Complaint, the County alleged that prior to the issuance of Rowe's final audit report, a draft report was provided to Frederick J. Homan, a member of the Board of Trustees for ERS, who was then serving as the Director of the County's Office of Budget and Finance. The County alleged that on May 28, 1998, Homan authored a memorandum titled "Response—ERS Compliance Audit." Numerical reference 4 of the memorandum stated that, "issues related to the inter-

pretation of State and County provisions will be discussed with the Office of Law." The County alleged that Homan recalled discussing with appellee the application of the Transfer Policy and that he "specifically sought the advice and counsel of [appellee] to clarify what, if any, fiduciary duty" the County Executive, as a member of the ERS Board of Trustees, had in regards to intervening in favor of a " 'prospective application' of a Board policy that would benefit Mr. Rowe, Mr. Willis, and others and would cost the ERS thousands of dollars."

On July 7, 2009, appellee filed a Motion to Dismiss the Amended Complaint, or in the Alternative, Motion for Summary Judgment, alleging that: (1) the Amended Complaint failed to set forth facts sufficient to demonstrate a violation of the rules of professional conduct; (2) the County waived the right to seek disqualification of appellee from representing Willis by failing to object to appellee's representation of Rowe on the exact issue for over a year; (3) the circuit court should decline to issue a declaratory judgment on the first two prayers for relief because the Court of Appeals has exclusive jurisdiction over attorney conduct matters; and (4) alternatively, the circuit court should decline to issue a declaratory judgment on the first two prayers for relief as the requested declaration would not terminate the controversy between the parties.[9] The County filed an Opposition to appellee's motion, and appellee filed a Reply to the County's Opposition.

On September 29, 2009, appellee deposed Homan. At the deposition, Homan testified that he was the only individual

---

9. In her Memorandum In Support of the Motion to Dismiss or, in the Alternative, Summary Judgment, appellee explained: "Whether or not the Court grants the County's third claim for relief to disqualify [appellee], the requested declarations that she violated [MLRPC] 1.9 and 1.11 will not resolve any issue between the parties." Appellee continued, alleging that: "Stated differently, if the Court issues a declaration that [appellee] is disqualified from representing Mr. Willis, it would have concluded that she has a conflict of interest that has not been waived and a separate declaration that she violated particular ethical rules would be unnecessary. Conversely, if the Court, after consideration of all the relevant factors, instead declares that [appellee] is not disqualified, there is no reason for this Court to consider whether she violated any of the ethical rules."

with personal knowledge of the allegations set forth in the Amended Complaint. Homan testified that he recalled having "maybe two or three" verbal conversations with appellee in 1998, around the time of the audit. Homan testified that these conversations concerned a possible ethical issue involving Rowe's actions during and after the preparation of the audit report. As to the discussion pertaining to the valuation rate, Homan testified that "the discussion was about the effect on Rowe and why Rowe was so interested in the one versus the other." Homan testified that he did not recall appellee providing any legal advice during these conversations and that he had no personal knowledge of whether or not appellee researched the issue. Homan testified that he understood the issue in Rowe's case to be "[t]he same as Mr. Willis'[ ] case .... generally the valuation rate versus the regular interest rate issue." Homan testified that he first became aware of appellee representing Rowe, a former County employee, shortly after Rowe resigned but when asked why he did not raise the issue earlier, he answered "I don't really have an answer for that." Homan testified that he believed, at that time, that appellee's representation was a violation of the MLRPC, and that "we discussed it internally but it wasn't raised until later."

On September 30, 2009, the County deposed appellee. At the deposition, appellee testified that during her tenure as County Attorney she was not aware of the ERS audit and had no recollection of any conversation with Homan about the audit. Appellee testified that she "remember[ed] having discussions at different times regarding issues [she] now [knew] to be part of that audit."

Appellee filed a Supplemental Memorandum in support of the Motion to Dismiss the Amended Complaint, or in the alternative Motion for Summary Judgment, which included excerpts from Homan's deposition. On November 30, 2009, the County moved to strike the supplemental memorandum.

On May 6, 2010, a hearing was held on appellee's Motion to Dismiss the Amended Complaint, or in the alternative Motion

for Summary Judgment [10] and the County's Motion to Strike the Supplemental Memorandum. The trial judge denied the County's Motion to Strike. The trial judge declined to rule on the Motion for Summary Judgment from the bench. Instead, after entertaining argument from both parties, the trial judge instructed the County that it had ten days to supplement its argument before a ruling on appellee's motion. On May 17, 2010, the County filed a Supplemental Opposition. On May 19, 2010, appellee filed a letter in response to the County's Opposition.

On June 21, 2010, the circuit court issued an Opinion and Order, granting summary judgment in favor of appellee. The circuit court stated:

To this court, the thrust of [appellee]'s motion is three fold: (1) Assuming the allegations contained in the verified amended complaint are accepted as true, they do not allege a violation of the Rules of MLRPC. Furthermore, reviewing the verified statements, affidavits, exhibits, attachments, etc. leads to the conclusion that there is no dispute as to any *material* fact and that the allegations and all supplied documents do not, cannot, and will not sustain a violation of Rule 1.9 and 1.11 of the MLRPC. (2) That given the representation by [appellee] of Mr. Rowe in excess of two years prior to the Willis matter without suggestion of a conflict of interest by the County and given the fact that the matter litigated in Rowe is the precise issue in dispute in the Willis matter, the County has waived its right to move for either a declaration that [appellee] has violated the rules or for her disqualification in the Willis matter. (3) As the County has asked this court for a *declaration* that [appellee] violated the rules involved, this court has no jurisdiction to do so as the Court of Appeals has the exclusive jurisdiction over such a matter upon a finding by the Attorney Grievance Commission that a violation has occurred. Additional-

---

**10.** The circuit court noted that it was going to treat the motion to dismiss as "tantamount to a motion for summary judgment."

ly, that the request for Declaratory Judgment will not, in effect, terminate the controversy between the parties.

For the reasons set forth below, this court is persuaded that [appellee]'s motion has merit and will grant her summary judgment.

(Emphasis in original).

As to appellee's alleged violation of the MLRPC, the circuit court held that "the allegations do not display a factual basis for a finding that the rules have been violated." The circuit court stated:

> To this court, as indicated, the Amended Complaint represents no more than speculation, conjecture and unfounded conclusions without indicating a true sufficient basis for the relief sought.... The written exhibits also failed to generate issues of material fact vis a vis [appellee]'s role as County Attorney and the precise issue contained in the Willis dispute. The court gave additional opportunity to the County to flesh out/provide facts upon which the court could find the requisite genuine dispute as to a material fact. The court can find none.

As to appellee's disqualification as counsel, the circuit court found that the County waived its argument that appellee should be disqualified from representing Willis, due to delay in bringing the request. The circuit court found that "the delay was due and occasioned by the County for tactical reasons."

As to jurisdiction, the circuit court found that "in seeking relief in this matter, [the County] is attempting to circumvent the entire process established to determine if an attorney has engaged in professional misconduct" and that the Court of Appeals has "primary jurisdiction" in a matter such as this one.

## STANDARD OF REVIEW

This Court reviews *de novo* a grant of summary judgment. *Injured Workers' Ins. Fund v. Orient Express Delivery Serv.*, 190 Md.App. 438, 451, 988 A.2d 1120 (2010) (citation omitted). We are "obliged to conduct an independent review of the

record to determine if there is a dispute of material fact. A material fact is one that will alter the outcome of the case, depending upon how the fact-finder resolves the dispute. Mere general allegations of conclusory assertions will not suffice." *Id.* at 450–51, 988 A.2d 1120 (citations and internal quotations omitted). We will uphold the grant of summary judgment "where there is no genuine dispute as to any material fact and the party in whose favor judgment is entered is entitled to judgment as a matter of law." *Id.* at 450, 988 A.2d 1120 (internal quotations and citations omitted). We resolve all reasonable inferences in favor of the non-moving party. *Id.* at 451, 988 A.2d 1120.

## DISCUSSION

### I.

On appeal, the County argues that the trial court erred in granting appellee's motion for summary judgment because a genuine dispute of material fact exists under MLRPC 1.9 and 1.11 as to whether: (1) appellee's representation of Willis is the "same or a substantially related matter" as her former representation of the County during her tenure as County Attorney; and (2) appellee is in possession of confidential government information obtained during her tenure as County Attorney, which could be used to the detriment of the County in her representation of Willis.[11]

In contrast, appellee responds that the trial court properly granted summary judgment as the case involves no genuine issues of disputed material fact. Appellee contends that Willis' appeal concerns purely a question of statutory interpretation[12] and she never conducted any research nor was she

---

**11.** Although we conclude that the circuit court has no independent jurisdiction to adjudicate an alleged violation of the MLRPC, we review the propriety of the circuit court's grant of summary judgment as the County contends that appellee's disqualification was contingent on alleged violations of the MLRPC.

**12.** Appellee contends the question of statutory interpretation is: "Does Md.Code. Ann., SPP § 37–203(f) permit the County to select the interest

asked to give a legal opinion with respect to whether the County was required to use the regular rate or the valuation rate of interest in calculating transferred retirement benefits. Appellee argues that she possesses no confidential information which could be used to the detriment of the County in her representation of Willis. Appellee notes that "all of the documents in this matter are public records in the public domain," and, as a result, there is no confidential information to be used to the County's disadvantage in the Willis appeal. In sum, appellee maintains that she has not violated MLRPC 1.9 or 1.11, and there is no basis on which to grant her disqualification.

### 1. Same or Substantially Related Matter

MLRPC 1.9, titled "Duties to Former Clients," provides in pertinent part: "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the **same or a substantially related matter** in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing." (Emphasis added). Comment 2, affixed to MLRPC 1.9, explains that "[t]he scope of a 'matter' for purposes of this Rule depends on the facts of a particular situation or transaction. The lawyer's involvement in a matter can also be a question of degree." "Matters are 'substantially related' for purposes of this Rule if **they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter.**" MLRPC 1.9, Comment 3 (emphasis added).

MLRPC 1.11 is titled "Special Conflicts of Interest for Former and Current Government Officers and Employees,"

---

rate used to discount the benefits attributable to the transferred years of non-contributory service or is the County required to use the 'regular interest rate' generally applied to contributions of contributing retirees?"

and largely mirrors MLRPC 1.9. MLRPC 1.11(a)(2) provides that "a lawyer who has formerly served as a public officer or employee of the government . . . shall not otherwise represent a client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, unless the appropriate government agency gives its informed consent, confirmed in writing, to the representation."

Interpretation of MLRPC 1.9 in Maryland case law is limited,[13] and is noticeably absent as to MLRPC 1.11. When evaluating the meaning of the phrase "the same or a substantially related matter," as set forth in MLRPC 1.9, for the purpose of determining attorney disqualification, this Court, in *Gatewood v. State*, 158 Md.App. 458, 468, 857 A.2d 590 (2004), *aff'd, Gatewood*, 388 Md. 526, 880 A.2d 322, observed that "[t]he case law in Maryland on this issue is sparse, but this is a point of law that crosses jurisdictional lines, and rulings from courts that have addressed similarly worded professional conduct rules are relevant." (Citations omitted). We noted that in addressing a similar rule of professional conduct, the Supreme Court of Kansas [14] observed:

---

**13.** *See Atty. Griev. Comm'n v. Siskind,* 401 Md. 41, 930 A.2d 328 (2007); *Gatewood v. State,* 388 Md. 526, 880 A.2d 322 (2005).

**14.** The Supreme Court of Kansas interpreted Model Rules of Professional Conduct ("MRPC") 1.9, titled "Conflict of Interest: Former Client" and MRPC 1.10, titled "Imputed Disqualification: General Rule." *Chrispens v. Coastal Ref. & Mktg.,* 257 Kan. 745, 750, 897 P.2d 104 (Kan.1995). The Supreme Court of Kansas set forth the applicable provisions of MRPC 1.9(a) which provide:
"A lawyer who has formerly represented a client in a matter shall not thereafter:
(a) represent another person in the same or a *substantially related matter* in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation." (1994 Kan. Ct. R. Annot. 320.) (Emphasis added.)
The pertinent provisions of MRPC 1.10 provide:
"(a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.8(c), 1.9, or 2.2.
(b) *When a lawyer becomes associated with a firm, the firm may not knowingly represent a person in the same or a substantially related matter in which that lawyer, or a firm with which the lawyer was*

There is widespread agreement that conflict questions involving former clients should be resolved through application of the substantial relationship test. However, there is no standard definition of what the test should compare in determining whether there is a close connection between the conflicting representations.

*Id.* (citation omitted).

In this case, the circuit court relied on *Franklin v. Clark*, 454 F.Supp.2d 356 (D.Md.2006), in determining whether a genuine dispute of material fact existed regarding appellee's alleged violations of MLRPC 1.9 and 1.11. In *Franklin*, the District Court applied MLRPC 1.11 in ruling on a motion to disqualify an attorney, who represented a terminated Baltimore City police officer, and previously represented the Baltimore City Solicitor's Office. 454 F.Supp.2d at 363–67. The District Court concluded that the matters of the attorney's prior and current representation were not the same or substantially related. *Id.* at 367. The District Court explained that the attorney "did not, and could not [have], engage[d] in any 'investigative or deliberative process' with regard to [the officer's] termination[,]" and therefore was not "substantially

---

associated, had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by Rule 1.6 and 1.9(b) that is material to the matter." (1994 Kan. Ct. R. Annot. 321–22).
(Emphasis added.)
*Chrispens*, 257 Kan. at 750, 897 P.2d 104 (emphasis in original). The Supreme Court of Kansas noted that: "The Model Rules do not provide a definition, nor do the comments to the rules attempt to define the phrase 'substantially related.' There is no Kansas case law addressing the meaning and application of the phrase 'substantially related matters' as used in MRPC 1.9(a) and MRPC 1.10(b)." *Id.* at 751, 897 P.2d 104. The Court then cited the ABA/BNA Lawyer's Manual on Professional Conduct, 51:225 which states:
Perhaps the most widely followed formulation of the substantial relationship test is that it compares the 'matter' or 'subject matter' of the former representation to that of the current representation. 'Matter' is the word used in Model Rule 1.9(a), and this word, or the term 'subject matter,' is a popular means of applying the substantial relationship test.
*Chrispens*, 257 Kan. at 751, 897 P.2d 104.

and personally involved" in the termination of the officer, pursuant to MLRPC 1.11(a). *Id.* at 366–67.

In deciding whether the scope of the attorney's former representation met the criteria of MLRPC 1.11, the District Court found it "helpful to review cases where former government attorneys were disqualified pursuant to MLRPC 1.11(a)[,]" such as:

In *United States v. Philip Morris, Inc.*, 312 F.Supp.2d 27 (D.D.C.2004), the court disqualified a former Justice Department attorney from representing a tobacco company after the government produced time sheets indicating that the attorney had logged more than 382 hours on substantially related litigation. In *Dugar v. Board of Educ.*, 1992 U.S. Dist. LEXIS 8650, 1992 WL 142302 (N.D.Ill.1992), the court disqualified an attorney bringing an action by a student who had been expelled because that attorney previously supervised the Chicago Board of Education attorneys who represented the board at student suspension and expulsion hearings. Likewise, in the companion case of *Porter v. Board of Educ.*, 1992 U.S. Dist. LEXIS 9617, 1992 WL 166570 (N.D.Ill.1992), the court disqualified an attorney who brought a suit on behalf of teachers contesting the board's disciplinary procedures because that attorney previously represented the board in teacher disciplinary actions.

*Id.* at 366. In contrast to the cases discussed above, the District Court in *Franklin* held that the attorney's involvement was "much more remote than the cases listed above." *Id.* For example, the attorney "assert[ed] that he has no knowledge whatsoever concerning the reasons for terminating [the officer], the underlying factual incidents leading up to [the officer's] termination, and the defendants' response to [the officer's] allegations that he was wrongfully terminated. Indeed, [the attorney] was fired approximately two months before the events giving rise to [the officer's] termination." *Id.*

As to MLRPC 1.11(c), the District Court in *Franklin* concluded that the attorney possessed no confidential information

which could be used to the material disadvantage of his former client. *Id.* at 368. The District Court acknowledged that the attorney had drafted a memorandum while representing the Solicitor's Office, which addressed the law relevant to his current representation of the terminated police officer.[15] *Id.* at 363–64, 367. The District Court concluded that even though the memorandum "likely constituted a confidential attorney-client communication when it was created[,] the defendants waived any expectation of confidentiality when they voluntarily produced it through the course of discovery." *Id.* at 367.

■ Returning to the present case, an examination of the record, in light of the case law discussed above, leads to the conclusion that the circuit court correctly determined that no genuine dispute of material fact existed as to whether appellee, during her tenure as County Attorney, was "substantially and personally involved" in the same matter being considered in Willis' administrative appeal. Similarly, the record reveals no genuine dispute of material fact as to whether appellee possessed confidential government information acquired during her tenure as County Attorney, which could have been used to the material disadvantage of the County in Willis' administrative appeal.

The sole source of information as to appellee's alleged conflict of interest is Homan. A review of Homan's deposition testimony reveals no facts from which a reasonable factfinder

---

**15.** The District Court stated that "[r]ecent discovery, . . . [in the form of a memorandum produced by the attorney from when he was associate counsel in the Baltimore City Solicitor's Office] revealed that [the attorney] was involved in confidential attorney-client communications that address the central issue in this case, *i.e.*, the law that controls the police commissioner's ability to discipline or terminate a command-level employee." *Id.* at 363. The attorney responded that "the memorandum was written as an abstract of law to explain relevant sections of the Public Local Laws . . . . [and] that the memorandum was prepared and written as a convenience to the individual reading the laws . . . and not as an official legal position with respect to any individual." *Id.* at 364. The attorney "estimate[d] that he spent less than an hour on the project." *Id.*

could determine that appellee violated MLRPC 1.9 and 1.11. Homan testified that he recalled "two or three" conversations with appellee regarding the calculation of the interest rate to be applied to transferred benefits. Nevertheless, according to Homan the substance of these conversations specifically involved whether Rowe had committed an ethical violation during and after the preparation of the 1998 audit report by advocating for the use of the regular interest rate, in contrast to the Transfer Policy, without disclosing the personal benefit he would obtain therefrom. As to the conversations, Homan testified:

[APPELLEE'S COUNSEL]: Do you have any memory of what was said during these conversations?

[HOMAN]: Yes, I do, and what the conversation—if I may just a little, just to put them in a little perspective so you know how they fit in.

[APPELLEE'S COUNSEL]: Sure.

[HOMAN]: The Auditor's Office began to do an audit of the system.

[APPELLEE'S COUNSEL]: Okay.

[HOMAN]: Prior or as the audit was beginning, I was advised that Mr. Rowe had raised an issue, a personal issue for himself of the issue between the valuation rate and the regular interest rate. That was communicated to members of my staff, one of whom was the Deputy Director, but also people inside would, to look at this matter.

[APPELLEE'S COUNSEL]: And "this matter" being the interest rate issue?

[HOMAN]: Yes.

[APPELLEE'S COUNSEL]: Okay. And what was the second conversation you had with [appellee] after this draft report that was pulled back that was making the recommendation to not follow up the policy?

[HOMAN]: Well, that was that, unbelievably enough, they'd actually done it without disclosing that they had a personal interest involved. I mean, they actually—

[APPELLEE'S COUNSEL]: When you said they had done it, they had—

[HOMAN]: They actually made a recommendation that Board policy not be followed.

[APPELLEE'S COUNSEL]: And other than disclosing that to [appellee], do you recall anything else about that conversation?

[HOMAN]: Yeah. We talked about the very fact that Rowe and others in the office—I don't think I knew about Willis specifically at that time—but Rowe and others in the office were going, would benefit by this recommendation.

Homan admitted that "there wasn't really any substance to" his second conversation with appellee. As to his third conversation with appellee, Homan testified that the substance of that conversation again involved perceived ethical violations by Rowe:

[APPELLEE'S COUNSEL]: And do you recall the substance of that conversation?

[HOMAN]: It was about this memo and it was about the fact that—it was also about ethics. It was about the [ ]valuation rate.... And essentially, the County Auditor had gone to the Council Chairman to write to him, the clear implication being that he wanted the County Executive to use his authority over other members of the Board of Trustees in their day-to-day capacities as department heads to make a change in the policy so they would be applied prospectively so that Mr. Rowe would have the regular interest rate versus the valuation rate utilized.

[APPELLEE'S COUNSEL]: Do you recall—you said you talked about the ethics, the valuation rate and the fact that it involved a councilman and the County Executive. Do you recall the substance of what you spoke about with regard to the ethics?

[HOMAN]: Yes. I, frankly, believe that Mr. Rowe had committed ethical violations and I thought that he had also led the councilman inadvertently, unsuspectingly, which turned out to be true later. The auditor, in fact, wrote the

memo. The chairman did not. And the chairman did not have the issues explained to him.

But essentially, it was about that the auditor had clearly crossed the line. He was asking for a prospective application to benefit himself and he had utilized the councilman to do that in contracting the Executive, knowing full well that Executive was an ex-officio member of the Board.

Homan specifically confirmed that the conversations he recalled with appellee regarding the correct transfer rate were limited in subject matter to a potential ethical issue involving Rowe:

[APPELLEE'S COUNSEL]: You also indicated that you discussed the valuation rate. I take it to mean you discussed the, which of the two ratings should be applied. Is that what the discussion was about with [appellee]?

[HOMAN]: And the discussion was about the effect on Rowe and why Rowe was so interested in the one versus the other.

[APPELLEE'S COUNSEL]: Do you recall any other conversations about the valuation rate other than why it would be to Mr. Rowe's benefit to use one rate over the other?

[HOMAN]: No.

Homan was asked several times in the course of his deposition if he recalled appellee providing any legal advice regarding the transfer rate, and each time he responded that he did not:

[APPELLEE'S COUNSEL]: And this was you communicating to [appellee] your views of the situation?

[HOMAN]: Yes.

[APPELLEE'S COUNSEL]: Okay. Did she, in response, give you any legal advice?

[HOMAN]: I don't recall her affirming or objecting. I don't remember her commenting in that regard at all.

[APPELLEE'S COUNSEL]: Okay. Do you recall if she gave you any legal advice regarding the ethics of the situation?

[HOMAN]: Well, she believed that Rowe had crossed the line, clearly. I mean, that wasn't an issue. I just don't remember whether or not she made a comment as to the other part of the issue, which was the Moxley issue.

\* \* \*

[APPELLEE'S COUNSEL]: Well, other than [appellee] agreeing that she thought that Mr. Rowe had acted unethically, do you recall anything else that she advised you?

[HOMAN]: No, I don't recall anything.

\* \* \*

[APPELLEE'S COUNSEL]: Did [appellee] provide any advice in regards to all of this information?

[HOMAN]: I don't recall that. No.

[APPELLEE'S COUNSEL]: Did she comment that you can recall in any way on this information you had provided to her?

[HOMAN]: I don't recall any specific comment. I mean, mostly the conversation about, it was incredible that they did that....

\* \* \*

[APPELLEE'S COUNSEL]: Did she opine to you that she believed that it did comply with the law?

[HOMAN]: No, and she didn't say that it didn't.

[APPELLEE'S COUNSEL]: But as far as you know, she never researched the issue; is that correct?

[HOMAN]: I honestly don't know if she ever researched the issue in that regard....

[APPELLEE'S COUNSEL]: But you have no personal knowledge whether she did or didn't?

[HOMAN]: I do not. I do not.

The issue in Willis' administrative appeal was whether the valuation interest rate or the regular interest rate would be utilized to calculate his retirement benefits. The record reveals that appellee was not personally involved in the calculation of Willis' retirement benefits during her tenure as County

Attorney. Appellee left her position as County Attorney in 2001, seven years prior to Willis' retirement, and his subsequent raising of the issue regarding the calculation of his retirement benefits. There are no facts indicating appellee was at all personally or substantially involved in the manner in which the County calculated transferred retirement benefits during her tenure as County Attorney. Appellee, like the attorney whose conduct was at issue in *Franklin,* "did not, and could not [have], engage[d] in any 'investigative or deliberative process' with regard" to Willis' appeal. *Franklin,* 454 F.Supp.2d at 366.

The County's Office of Law set forth a legal opinion on the transfer policy in the November 28, 1990, memorandum, prior to the start of appellee's tenure as County Attorney. The Office of Law drafted another legal opinion, addressing the transfer rate, in 2003, after the conclusion of appellee's tenure as County Attorney. Homan did not recall any conversations with appellee regarding what the legally correct transfer rate should be.[16] Homan specifically testified that appellee never rendered a legal opinion as to what the legally correct transfer rate should be. Homan did not know if appellee ever researched the issue. Based on the record, the circuit court properly determined that there was no genuine dispute of material fact as to appellee's having represented another in the same or a substantially related matter in violation of MLRPC Rules 1.9 and 1.11, and no genuine dispute of material fact as to appellees' disqualification.[17]

---

16. The County points to a memorandum drafted by Homan in response to an initial draft of the audit report, in which he noted an intention to consult with the Office of Law regarding Issue No. 4, titled, "Claim for Prior Service Credit." The County contends this is evidence that appellee discussed the matter of the legally correct transfer rate with Homan. The matter at issue in Willis' case, however, is not the claim for prior service credit, but the transfer policy. The transfer policy is addressed in Issue No. 3 of Homan's memorandum, and that section makes no mention of discussing the issue with the Office of Law.

17. The County's attempt to frame the "matter" at issue in Willis' administrative appeal as the audit of the ERS in general, is not persuasive. In fact, the County's sole witness, Homan, testified that the

### 2. Confidential Government Information

A review of Homan's deposition reveals no genuine dispute of material fact as to whether appellee possessed confidential government information which could be used to the detriment of the County in Willis' administrative appeal.[18]  Homan testified that he could not identify with specificity any confidential information which appellee might possess:

> [APPELLEE'S COUNSEL]: And it's your belief today that [appellee] possesses confidential information of the County's that she can use to the County's detriment in the Willis matter?
>
> [HOMAN]: I believe, as I said before, that [appellee], going back to the period of this audit, knew exactly what the County's position was.  But was aware or should have been aware that the County Attorney's office was involved in the adoption of the policy, and if at any point in time had any

issue was "the same" as that in Rowe's administrative appeal, "generally the valuation rate versus the regular interest rate issue."  Homan testified:

> [APPELLEE'S COUNSEL]: What's your understanding of the issues that are involved in Mr. Willis'[ ] case against the County?
>
> [HOMAN]: Mr. Willis believes that rather than the valuation rate being used in accordance with Board policy that dates back, Board of Trustees policy that dates back to 1991, that a regular interest rate should have been used.  The result of that would have been to discount at a lower interest rate which would have net increased his pension benefit by some amount.  I don't remember the amount.

18.  The County contends that appellee provided her legal opinion of the audit in several memoranda, and that these opinions are the equivalent of possessing confidential government information, which could be used to the material disadvantage of the County.  We disagree.  The record reflects that Homan testified that he was unaware of appellee rendering any legal opinion as to the interest rate.  To the extent that the County contends appellee possesses confidential information, it is not sufficient to generate a genuine dispute of material fact as to appellee's involvement in rendering an opinion on the interest rate.  Homan testified that he had three conversations with appellee on the interest rate issue, however, these conversations mainly covered Rowe's involvement in the matter and a public memo from a councilmen to the County Executive.  There is nothing in the record that states appellee was personally involved in rendering the interest rate for this case or that the conversations with Homan provided confidential government information.

doubts about whether or not the County was doing what was appropriate, should have raised those issues to her client at the time. Having not, having not done that, I have to assume, presume that she believed that what we were doing was appropriate.

[APPELLEE'S COUNSEL]: My question was a little more specific. Do you contend that presently, [appellee] possesses confidential information of the County's that she can use to the County's detriment in the Willis matter?

[THE COUNTY'S COUNSEL]: Objection. Calls for a legal conclusion. You can answer.

[HOMAN]: Without walking through every piece of information that was in there, I guess at this point in time, through discovery in Rowe, through the whole issue of Rowe that the auditor, the actuary's discussions, the discussions related to single annuity and the like, although, quite frankly, I'm not sure that access to, that [the outside consultant's] original report did not play a role in that regard. So I guess it's very hard for me to answer in that regard as to whether or not there's any technical information.

[APPELLEE'S COUNSEL]: Well, let me ask you this. Can you identify for me specifically any confidential information that you believe that [appellee] possesses that she can use to the County's detriment in the Willis matter?

[THE COUNTY'S COUNSEL]: Objection. Calls for a legal conclusion.

[HOMAN]: Not that I—

[THE COUNTY'S COUNSEL]: Asked and answered.

[HOMAN]: Not that I can think of specifically beyond what I've said.

Homan's testimony failed to demonstrate that appellee had been exposed to any confidential information which could be used to the detriment of the County.[19] Comment 3 affixed to

---

19. Additionally, as the County has placed into the public record legal opinions developed before and after appellee's tenure as County Attor-

MLRPC Rule 1.9 states "[m]atters are 'substantially related' for purposes of this Rule if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation **would materially advance the client's position in the subsequent matter.**" (Emphasis added). In this case, based on Homan's testimony, it has not been established that appellee possessed any alleged confidential information that would affect the outcome of Willis' upcoming appeal.[20]

In its Memorandum Opinion, the circuit court concluded that "the issue of the 'discount rate' is one of statutory interpretation/construction and is not a factual issue at all" and "even discussions about the transfer rate (not even al-

---

ney addressing the transfer policy, and has provided numerous other documents to appellee in discovery for the Rowe appeal relating to the 1998 audit, the County has waived any expectation of confidentiality in these attorney-client communications. *See Franklin*, 454 F.Supp.2d at 367.

The County has provided a number of documents to appellee, through discovery in the Rowe appeal, including: (1) the public written opinions from the County's Office of Law on the legally correct transfer rate from 1990, and 2003; (2) the 1998 audit report; (3) Homan's memorandum response to the audit report; (4) Chairman Moxley's 1998 Memorandum to County Executive Ruppersberger regarding retroactive application of the Transfer Policy; and (5) the memoranda from Buck's Consultants opining on the County's transfer policy from 1990 and 2007.

**20.** The County relies on *Tessier v. Plastic Surgery Specialists, Inc.*, 731 F.Supp. 724, 730 (E.D.Va.1990) and *Analytica, Inc. v. NPD Research, Inc.*, 708 F.2d 1263, 1266 (7th Cir.1983) for the proposition that a lawyer may not represent an adversary of his former client "if the lawyer could have obtained confidential information in the first representation that would have been relevant in the second." The County has, however, put forward no facts sufficient for a reasonable fact finder to determine that confidential information relevant to any issue in Willis' appeal "could" have been received by appellee during her tenure as County Attorney. The County's contention that appellee "could have" obtained confidential government information from casual conversations or inter-office memoranda is mere speculation. "Mere speculation as to the possible existence of a factual dispute will not defeat a motion for summary judgment." *A.J. Decoster Co. v. Westinghouse Elec. Corp.*, 333 Md. 245, 262, 634 A.2d 1330 (1994).

leged) would not necessarily have generated the conflict suggested." We agree. The procedure for calculating the discount rate is provided in SPP § 37–203(f)(2), as amended in 2007, which provides:

> [I]f an individual transfers from a noncontributory system to a contributory system, on retirement the individual's retirement allowance shall be reduced by the actuarial equivalent of the member contributions that would have been deducted if the individual had earned the transferred service credit under the new system, **including regular interest on those contributions.**

(Emphasis added). Rowe's appeal involved the same matter at issue in Willis' appeal—whether the County was required to use the regular rate of interest to calculate transferred benefits, or if it was legally permitted to use the valuation rate. In Rowe's appeal, the Board analyzed the statutory history of SPP § 37–203(f)(2) and concluded that the 2007 amendment clarified that "[t]he intention [of the Legislature] has always been to utilize regular interest in the computation of the reduction." The Board's decision that the County must use the regular interest rate in the computation reduction was one of statutory interpretation. As the record fails to substantiate that appellee actually possessed confidential information, and reflects that the Board's decision was based on an interpretation of the 2007 amendment to SPP § 37–203(f)(2), no confidential information allegedly possessed by appellee could have materially advanced Willis' case before the Board. As such, we perceive no error in the circuit court's grant of summary judgment in favor of appellee.

## II.

■ Appellee argues that the circuit court correctly found that the County waived the right to raise the issue of her disqualification as Willis' attorney in the administrative appeal. Appellee contends that the County could have raised this issue as early as the start of her representation of Rowe in March 2007, but delayed filing the motion for "tactical reasons to discourage the filing of a class action" lawsuit by appellee.

Appellee contends that the County "was long ago aware of all of the now alleged 'facts' and therefore, there is no other rational explanation for why the County never raised the issue in the *Rowe* case and waited until right before the hearing in the *Willis* case to raise the issue."

In contrast, the County argues that it has not waived the right to raise appellee's disqualification as Willis' attorney in the administrative appeal. The County contends that the "length of delay is not dispositive on the issue of disqualification and that courts have the duty and power to ensure that the attorneys practicing before it maintain high ethical standards, and such cannot be defeated by laches." The County contends that any delay in filing the request for disqualification was not motivated by tactical reasons.

After consideration of the parties' respective positions and the facts and circumstances of the case, we conclude that the circuit court properly determined the County waived the ability to request appellee's disqualification. It has been recognized that "[d]isqualification is a drastic remedy since it deprives litigants of their right to freely choose their own counsel." *Gross v. SES Americom, Inc.,* 307 F.Supp.2d 719, 722 (D.Md.2004) (citations omitted). Discussing the issue of disqualification, in *Franklin,* 454 F.Supp.2d at 365, the District Court explained:

> Maryland courts are hesitant to grant disqualification motions, particularly where the opposing party is the sponsor of such a motion, because they can be abused for tactical reasons. Indeed, "[w]hen an opposing party moves for disqualification of the other party's counsel, the court will take a hard look at such a motion. The concern is that the opposing party will use such a motion to block, harass, or otherwise hinder the other party's case." *Klupt v. Krongard,* 126 Md.App. 179, 728 A.2d 727, 740 (Md.App.1999). To that end, this court must "closely scrutinize" the disqualification motion. *Id.*

"[D]isqualification at the urging of opposing counsel is permitted only 'where the conflict is such as clearly to call in

question the fair and efficient administration of justice.'" *Gross,* 307 F.Supp.2d at 723. Although "[d]elay is certainly an important factor ... the mere length of delay is not dispositive and the Court should not deny a motion to disqualify based on delay alone." *Buckley v. Airshield Corp.,* 908 F.Supp. 299, 307 (D.Md.1995).

Maryland appellate courts have not yet commented on the issue of waiver of the ability to request attorney disqualification. The County relies on the District Court case *Buckley,* 908 F.Supp. at 307, for the proposition that the "length of delay is not dispositive on the issue of waiver of disqualification[.]" The District Court set forth the following standard of review for a request to disqualify:

> In evaluating a disqualification motion, a court must first determine whether an attorney-client relationship existed between the challenged law firm and the objecting client, and then resolve whether the matter at issue in the challenged representation is the same or substantially related to the matter involved in the prior representation. *Stratagene v. Invitrogen Corp.,* 225 F.Supp.2d 608, 610 (D.Md.2002). However, if the former client "was concededly aware of [the challenged law firm]'s representation of [the former client] but failed to raise an objection promptly when [it] had the opportunity," this failure will result in the waiver of the right to raise the disqualification issue. *Buckley,* 908 F.Supp. at 308.

> When determining whether a party has waived its right to move to disqualify counsel, the Court must examine whether the party filed its motion in a timely manner. *See Buckley,* 908 F.Supp. 299 (1995). Timely service of a motion to disqualify helps to curb the potential use of the motion as a litigation tactic or to harass the opposing party. *See id.* Courts analyze a number of factors when considering whether the motion was timely made, including:

> > when the movant learned of the conflict; whether the movant was represented by counsel during the delay; why the delay occurred, and, in particular, whether the motion was delayed for tactical reasons; and whether

disqualification would result in prejudice to the nonmoving party.

*Buckley,* 908 F.Supp. at 307, quoting *Employers Ins. of Wausau v. Albert D. Seeno Construction Co.,* 692 F.Supp. 1150, 1165 (N.D.Cal.1988).

*Gross,* 307 F.Supp.2d at 723.

In the absence of Maryland state case law, we will consider the factors outlined by the District Court in *Buckley,* to determine whether the County has waived the issue of disqualification. As to the first factor, when the movant learned of the conflict, appellee notified the County in March 2007, that she intended to represent Rowe, a retiring County employee, in a challenge to the calculation of his retirement benefits. Rowe's appeal involved the same issue as Willis' appeal, and the issues of conflict and disqualification were equally relevant in Rowe's appeal. The County failed to seek appellee's disqualification as Rowe's attorney or to raise any objection whatsoever to appellee's representation of Rowe. On January 21, 2009, nearly two years after the County became aware of appellee's representation of Rowe, the County filed the first complaint for declaratory judgment, seeking a ruling that appellee violated MLRPC 1.9 and 1.11 in her representation of Willis, and first sought appellee's disqualification on June 9, 2009, in its Amended Complaint.

In a letter to the Board, dated August 13, 2008, appellee announced her representation of Willis in contesting the calculation of his retirement benefits. The County waited a period of five months until filing its first complaint for declaratory judgment on January 21, 2009, and nearly a year before filing its first request for disqualification on June 9, 2009. It is fair to say that the County was aware of appellee's representation of Willis but failed to raise a prompt objection.

The second factor concerns whether the County was represented by counsel for the entire period of delay. Indeed, appellee's correspondence with the County during this period was primarily with the County's Office of Law.

As to the third factor, "[w]hy the delay occurred, and, in particular, whether the motion was delayed for tactical reasons," the County contends its delay was not due to tactical reasons. The County contends that the delay was due to an attempt to resolve the matter of appellee's representation of Willis informally. The County, however, raised no informal objections to appellee's representation of Rowe, and provides no explanation for why formal disqualification was not sought during the Rowe appeal. During his deposition, Homan was asked why the County did not move to disqualify appellee from representing Rowe, and Homan could provide no explanation:

[APPELLEE'S COUNSEL]: When's the first time that you learned [appellee] was representing a Baltimore County employee or former Baltimore County employee with regard to the interest rate issue?

[HOMAN]: I don't remember the date but it was sometime after word spread through the county from the Auditor's Office that Rowe had resigned and had declared that he was going to file suit against the County. Sometime after that.

[APPELLEE'S COUNSEL]: At that point, did you contact [appellee] and raise an objection to her representing Mr. Rowe?

[HOMAN]: I did not. I have not. I don't think, except for saying hello, I've had conversation with [appellee].

[APPELLEE'S COUNSEL]: Do you know if anybody from the County contacted [appellee] and objected to her representing Mr. Rowe?

[HOMAN]: Later but not at that time that I'm aware of.

[APPELLEE'S COUNSEL]: Okay. Is there some reason you didn't raise that issue at that time?

[HOMAN]: I believe from the beginning that it's been a violation. I think what the, the reason that it hadn't happened and I think the reason that most of the contacts that were made were at first informal and then finally formalized was because there was a belief on our part that she wasn't ultimately going to go there.

[APPELLEE'S COUNSEL]: When you say ultimately going to go there, what do you mean?

[HOMAN]: I think ultimately, we believed that when we pointed out to her that this was an issue, that, you know, she would ultimately agree.

[APPELLEE'S COUNSEL]: But the question is why didn't you point it out as an issue earlier?

[HOMAN]: I don't have an, I don't really have an answer for that. I don't.

\* \* \*

[APPELLEE'S COUNSEL]: But you chose not to raise it correct?

[HOMAN]: We discussed it internally but it wasn't raised until later. That's correct.

[APPELLEE'S COUNSEL]: And you can't give me a reason for why it wasn't raised earlier?

[THE COUNTY'S COUNSEL]: Objection. Asked and answered.

[APPELLEE'S COUNSEL]: Is that correct?

[HOMAN]: Well, that's correct.

[APPELLEE'S COUNSEL]: Why did you decide to send, or strike that. Why did you decide to raise the issue in the Willis matter?

[HOMAN]: It's no different than what I said a second ago. I continue to believe in both the Rowe and Willis matter it's inappropriate.

[APPELLEE'S COUNSEL]: But is there some reason you did decide to raise it in the Willis matter after not raising it in the Rowe matter?

[HOMAN]: Well, we did raise it late in the Rowe matter, I believe. Or later in the Rowe matter, I believe.

In a letter dated November 5, 2008, the County for the first time notified appellee of its opposition to her representation of retiring County employees. The County sent the letter shortly after receiving notice from appellee of her intention to bring a class-action lawsuit representing "all similarly situated past

and future retirees." In a letter dated October 22, 2008, appellee wrote:

> [N]otice is hereby provided on behalf of Messrs, Willis and Rowe of their intent to pursue claims for underpaid benefits, interest, fees and costs, as well as injunctive, declaratory, mandamus and class action relief against the County, the Retirement System and its Board of Trustees, and the Director of Budget and Finance, under state, county, constitutional and common law, on behalf of themselves and all other similarly situated past and future retirees who transferred service credit from a noncontributory system to the County Retirement System.

Based on the timing of the County's response, a logical inference is that the County sought appellee's disqualification to avert her representation of a potential class of plaintiffs on the same issue in the future. The timing of the County's formal request on January 21, 2009, for appellee's disqualification, six days before Willis' appeal was scheduled to be heard on January 27, 2009, suggests tactical reasons for the request, as the County had been aware for at least two months that the matter would not be resolved informally, and that appellee would proceed with her representation of Willis.

As to the fourth factor, whether disqualification would result in prejudice to the nonmoving party, we note that the appeal in Willis' case has been delayed for more than two years due to litigation of this issue. Forcing Willis to start the appeal anew with new counsel would undeniably result in the prejudice of further delay. All of the factors discussed above lead to the conclusion that the circuit court properly determined that through the County's inaction, despite ample prior notice of appellee's representation of Willis, and indeed, Rowe, the County waived the ability to request appellee's disqualification.

### III.

The County contends that it is within the circuit court's jurisdiction to determine via declaratory judgment whether

appellee violated MLRPC 1.9 and 1.11. The County denies that it sought disciplinary action against appellee under the MLRPC. The County maintains that it "merely [sought] an interpretation of the ethical rules in a concrete factual setting, which is commonplace in Maryland courts."

In contrast, appellee argues that the circuit court properly found that it did not have jurisdiction to consider the County's request for a ruling as to whether appellee violated the MLRPC. Relying on *Atty. Griev. Comm'n v. Reinhardt,* 391 Md. 209, 220, 892 A.2d 533 (2006), appellee contends that "[i]n Maryland, the Court of Appeals 'has original and complete jurisdiction over all attorney disciplinary matters arising from the conduct of a member of the Maryland State Bar.'" According to appellee, "the Court of Appeals is the ultimate arbiter of any complaints concerning attorney misconduct in the State of Maryland and whether a Maryland attorney has violated the rules governing attorney conduct." We agree.

In *Atty. Griev. Comm'n v. Pak,* 400 Md. 567, 599–600, 929 A.2d 546 (2007), *cert. denied,* 552 U.S. 1099, 128 S.Ct. 905, 169 L.Ed.2d 729 (2008), the Court of Appeals explained that it has exclusive jurisdiction in proceedings involving an attorney's alleged violation of ethical rules:

> The Court of Appeals has original and complete jurisdiction over all attorney disciplinary matters arising from the conduct of a member of the Maryland State Bar. *Attorney Grievance Comm'n v. Reinhardt,* 391 Md. 209, 220, 892 A.2d 533, 539 (2006) ("[T]his Court has original and complete jurisdiction in attorney discipline matters"); *Attorney Grievance Comm'n v. Maignan,* 390 Md. 287, 292, 888 A.2d 344, 347 (2005) ("Original jurisdiction over attorney discipline matters resides in the Court of Appeals. We determine, ultimately, whether an attorney has committed the misconduct charged by the Attorney Grievance Commission."); *Attorney Grievance Comm'n v. James,* 385 Md. 637, 654, 870 A.2d 229, 239 (2005) ("In proceedings involving attorney discipline, this Court has original and complete jurisdiction"). This Court is the ultimate arbiter of any claims concerning attorney misconduct in the State of Mary-

land, and the rules and procedures governing an Attorney Grievance action are predicated upon the Court of Appeals having jurisdiction to hear such a case.

The section of the MLRPC titled "Scope," confirms that a violation of a professional conduct rule does not give rise to an independent cause of action, nor does an opposing party have standing to seek enforcement of the rule through a collateral proceeding:

> Violation of a Rule does not itself give rise to a cause of action against a lawyer nor does it create any presumption that a legal duty has been breached. In addition, violation of a Rule does not necessarily warrant any other non-disciplinary remedy, such as disqualification of a lawyer in pending litigation. The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability. Furthermore, the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule.

Md. Lawyer's R. Prof'l Conduct Scope.

In this case, we conclude that the circuit court correctly determined that it does not have jurisdiction to determine whether appellee violated MLRPC 1.9 and 1.11 in a declaratory judgment action.[21] Maryland case law and the MLRPC are

---

**21.** At oral argument, the County argued that an appearance of impropriety is an independent basis for appellee's disqualification. This, however, is the first instance in which the County raised the issue of the appearance of impropriety as an independent basis for disqualification.

In the Amended Complaint for Declaratory Judgment, the County sought declaratory judgment on a third ground-appellee's disqualification. In the Amended Complaint within Count 1, the County asked that the circuit court declare that appellee violated MLRPC 1.9 and 1.11 and added the language: "That this Court declare that [appellee] be disqual-

clear—the Court of Appeals is the sole arbiter of whether a Maryland attorney has violated one of the rules of professional conduct. In other words, "[t]he ultimate decision as to whether an attorney has engaged in misconduct is to be made by [the Court of Appeals]." *Attorney Grievance Comm'n v. Kent,* 337 Md. 361, 371, 653 A.2d 909 (1995) (quoting *Attorney Griev. Comm'n v. Joehl,* 335 Md. 83, 88, 642 A.2d 194 (1994)).

Maryland Rules 16–701 through 16–781, titled "Discipline and Inactive Status of Attorneys," set forth the procedure to

---

ified from representing David Willis, Jr. in the administrative appeal of the decision of the ERS Board of Trustees, which is currently pending before the Baltimore County Board of Appeals." Within Count 2, the County asked that the circuit court declare that appellee violated MLRPC 1.9 and 1.11 and added the language: "That this Court declare that [appellee] be disqualified from representing David Willis, Jr. in the administrative appeal of the decision of the ERS Board of Trustees, which is currently pending before the Baltimore County Board of Appeals." Nothing in the County's Amended Verified Complaint for Declaratory Judgment provides a basis of the County's request that appellee be disqualified, other than appellee's alleged violation of MLRPC 1.9 and 1.11.

In its brief on appeal, the County contends that "the **rules** prohibit the 'appearance of impropriety.'" (Emphasis added). In its Reply Brief, the County argues that "the [c]ircuit [c]ourt should have declared that [appellee] violated Rules 1.9 and 1.11 of the MLRPC **and as such,** should have been disqualified from representing Mr. Willis." (Emphasis added).

At no point prior to oral argument did the County argue the "appearance of impropriety" to be an independent basis on which the circuit court could have disqualified appellee from representing Willis. As a result, the County failed to raise the issue of the appearance of impropriety as an independent basis for disqualification before the circuit court. Md. Rule 8–131 ("Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court[.]").

Assuming *arguendo,* that the issue was raised before the circuit court, the outcome would likely have been the same. The MLRPC does not contain a rule on the appearance of impropriety. The Court of Appeals has stated that although the appearance of impropriety is an "important consideration that a judge may take into account in the exercise of his or her discretion," there is no *per se* rule requiring disqualification once an appearance of impropriety is believed to exist." *Gatewood v. State,* 388 Md. 526, 546, 880 A.2d 322 (2005) (citation omitted) (emphasis in original). The Court is reluctant to "require disqualification when merely an appearance of impropriety is shown to exist." *Gatewood,* 388 Md. at 546–47, 880 A.2d 322 (citation omitted).

be utilized in addressing an attorney's alleged violation of the MLRPC. Pursuant to Maryland Rule 16–731, a complaint alleging that an attorney has engaged in professional misconduct is to be sent in writing to Bar Counsel.[22] A complaint is subject to investigation by Bar Counsel, and if found to be frivolous, unfounded or not alleging facts which, if true, would demonstrate either professional misconduct or incapacity, may be dismissed without further action. Md. Rule 16–731. Pursuant to Maryland Rule 16–734, if Bar Counsel concludes that the complaint is not frivolous, Bar Counsel conducts an investigation and makes a recommendation for action. Under Maryland Rule 16–734, Bar Counsel may recommend action resulting in: (1) dismissal of the complaint, (2) approval of a Conditional Diversion Agreement, (3) issuance of a reprimand, (4) preparation of a formal statement of charges—subject to peer review—or (5) an immediate disciplinary or remedial action.[23] Md. Rule 16–734. If Bar Counsel files charges, the attorney subject to investigation is entitled to a hearing in the circuit court, where the "judge shall prepare and file or dictate into the record a statement of the judge's findings of fact, including findings as to any evidence regarding remedial action, and conclusions of law." Md. Rule 16–757. The Court of Appeals reviews the circuit court's conclusions of law *de novo*, and reviews any exceptions to the circuit court's findings of fact using a clear and convincing evidence standard. Md. Rule 16–759(b). Pursuant to Maryland Rule 16–759(c), "[t]he Court of Appeals may order: (1) disbarment, (2) suspension, (3) reprimand, (4) inactive status, (5) dismissal of the disciplin-

22. Md. Rule 16–712 provides that the Attorney Grievance Commission shall select an attorney to serve as Bar Counsel. Md. Rule 16–711(a) provides that the "Attorney Grievance Commission ... shall consist of 12 members appointed by the Court of Appeals. Nine members shall be attorneys and three members shall not be attorneys."

23. Pursuant to Maryland Rule 16–751, Bar Counsel may file a Petition for Disciplinary or Remedial Action in the Court of Appeals. Maryland Rule 16–751(c) provides that: "The petition shall be sufficiently clear and specific to inform the respondent of any professional misconduct charged and the basis of any allegation that the respondent is incapacitated and should be placed on inactive status."

ary or remedial action, or (6) a remand for further proceedings." All proceedings remain confidential unless and until a petition for disciplinary or remedial relief is filed. Md. Rule 16–723. It is clear that to pursue an alleged violation of the MLRPC, a complaint must be instituted, in writing, to Bar Counsel, pursuant to Maryland Rule 16–731, and that the process set forth above confers jurisdiction upon the Court of Appeals to resolve the complaint. We know of no statute, rule, or Maryland appellate authority conferring jurisdiction on the circuit court to adjudicate an alleged violation of the MLRPC via declaratory judgment, and despite appellant's contentions, we decline to conclude that such jurisdiction exists.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**