REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 01453

September Term, 2013

_____


BRIAN V. McALLISTER

v.

THERESA C. McALLISTER

_____


Zarnoch,
Arthur,
Rodowsky, Lawrence F.
    (Retired, Specially Assigned),

JJ.

_____


Opinion by Arthur, J.

_____


Filed: August 1, 2014

This appeal involves a particularly acrimonious custody dispute. The Circuit Court for Howard County denied the father's complaint to modify custody and rejected his attack on the attorney whom the court had appointed to represent his two minor children. In the process, the court held the father in contempt for willfully refusing to pay child support, alimony, and other childcare expenses and ruled that he lacked substantial justification to prosecute his case after the first of several hearings. We shall affirm.

## FACTUAL AND PROCEDURAL HISTORY

The parties to this dispute are Brian and Theresa McAllister, the natural parents of 13-year-old Ian McAllister and 10-year-old Ethan McAllister. We recount the pertinent facts in the light most favorable to Ms. McAllister, the party who prevailed below. *L.W. Wolfe Enters., Inc. v. Maryland Nat'l Golf, L.P.*, 165 Md. App. 339, 343 (2005).

### A. Separation, Divorce, and the Initial Disputes Over Custody

The McAllisters' marriage deteriorated, resulting first in separation and then, on February 28, 2012, with a judgment of absolute divorce that incorporated prior written agreements between the parties. Those agreements included a "parenting agreement" that awarded Ms. McAllister sole legal custody and primary physical custody over the children; Mr. McAllister received visitation rights.

In the period leading up to the divorce and in its immediate aftermath, neither parent behaved admirably. Ms. McAllister admitted that she was angry and that she said and wrote inappropriate things at the time. On one occasion, in December 2011, she called the police in an apparent effort to get the children away from Mr. McAllister. On

another, in January 2012, she insulted him, threatened to call the police, and gratuitously reminded him that she had sole custody. Both before and after the divorce, she would depart from the terms of the parties' visitation agreement, keep the children during her husband's time, and interfere with his visitation rights.

Mr. McAllister saved videorecordings from the same period, evidently believing, erroneously that they would cast him in a favorable light. At the trial of this matter, the domestic master disagreed, calling one of the recordings "particularly disturbing." That recording showed the parents arguing, in the children's presence, while the older child, Ian, was becoming visibly "uncomfortable." Neither parent acted responsibly by disengaging.

B. **Mr. McAllister's Arrest on April 14, 2012, and Its Consequences**

Even before the divorce, Mr. McAllister's relationship with Ian had become strained. The strained relationship deteriorated further on April 14, 2012, when Ms. McAllister received a text message from her younger son, Ethan, in which the child reported that his father was "beating Ian." Ms. McAllister responded by calling the police, who came to Mr. McAllister's residence, interviewed the children, and placed him under arrest. Ms. McAllister followed up by pressing criminal charges against her ex-husband and pursuing a protective order on the children's behalf.

The district court eventually denied a final protective order, the Department of Social Services found that the charges against Mr. McAllister were unsubstantiated, and

2

the State entered a *nolle prosequi* on the criminal charges. Nonetheless, the domestic master found, in this case, that "whatever happened" on April 14, 2012, "was frightening and upsetting to the children."[1]

After his arrest, Mr. McAllister did not have any visitation with Ethan until July or with Ian until October. In fact, on at least two occasions, Ian affirmatively refused to go with his father when Mr. McAllister attempted to pick him up at school and to take him to school. Mr. McAllister asserted that his ex-wife had obstructed his visits and tried to turn his sons against him. Ms. McAllister, in turn, argued that the children simply refused to see him even though she continually encouraged them to go.[2]

### C. Mr. McAllister's Custody Complaint, His Cessation of Alimony and Support Payments, and the Appointment of the BIA

On July 30, 2012, Mr. McAllister filed a complaint for modification of custody, requesting sole custody of the children. At about the same time, Mr. McAllister began to withhold his monthly alimony and child support payments and to apply them to the mortgage payments on the family home which had been listed for sale, but had not yet found a buyer. Mr. McAllister justified his conduct by arguing that his wife, who was

---

[1] Mr. McAllister denied that he assaulted his son. He asserted that he appropriately disciplined Ian by grabbing him by the arm after Ian repeatedly acted out in the presence of a guest.

[2] Ms. McAllister attributed the children's reaction to their discovery that their house was to be sold as part of the divorce settlement, as well as to the disputed events of April 14, 2012. In addition, Mr. McAllister took other actions that further estranged him from Ian, such as giving away his guinea pigs and cancelling his membership at a fitness center.

living in the house, had not made the payments even though the divorce judgment did not obligate her to do so. He sought, but failed to obtain, a court order that would have authorized him to redirect the alimony and child support payments to the mortgage payments.

Ms. McAllister responded to her husband's redirection of the alimony and child support payments by petitioning to have him held in contempt. She responded to the complaint for modification of custody with an answer and motion asking the court to appoint a best interests attorney or "BIA" to represent her sons. *See Maryland Guidelines for Practice for Court-Appointed Lawyers Representing Children in Cases Involving Child Custody or Child Access*, § 2.1.1. Over Mr. McAllister's objection, the court appointed a BIA on October 18, 2012.

In what might be regarded as retaliation for Ms. McAllister's contempt petition, Mr. McAllister petitioned to have her held in contempt in November 2012 for allegedly denying him his visitation rights.

**D.     The Conference Call with the BIA on January 23, 2013**

The court scheduled a hearing on the custody issue for January 30, 2013. A week before the scheduled hearing date, on January 23, 2013, counsel for both parties participated in a conference call with the BIA, who told them that she would recommend that Mr. McAllister's custody complaint be dismissed. During that call, counsel for Mr. McAllister expressed his desire that Ian participate in "reunification counseling" with

4

Stanley Sack, Ph.D. Ms. McAllister consented, but the BIA reserved judgment on Dr. Sack.

### E. The First Hearing on January 30, 2013

The parties appeared for a hearing before a master on the custody issue on January 30, 2013. After arriving half an hour late, counsel for Mr. McAllister protested that the court had allocated only three hours to the issue, terming it a "violation" of his client's "due process rights." With the consent of the administrative judge, the master agreed to allow Mr. McAllister to have additional time to present his case and to give Ms. McAllister a comparable amount of time.

Mr. McAllister took the entire day to present his case, calling three witnesses (including himself) and introducing numerous exhibits. At the end of the day, he rested his case, without reservation, and reserved no time for rebuttal. For her part, Ms. McAllister reiterated her consent to reunification counseling with Mr. McAllister's counselor of choice, Dr. Sack. The BIA agreed as well.

The court eventually scheduled the hearing to resume on April 15, 2013.

### F. The McClelland Letter

Meanwhile, Mr. McAllister had received (and apparently solicited) an unsigned letter, dated January 29, 2013, from Karen McClelland, a licensed clinical social worker who had counseled Mr. and Ms. McAllister (both jointly and individually) and had conducted two "reconciliation therapy" sessions with Ian and his father. In her letter, Ms.

McClelland expressed the opinion that Ian was "moderately to severely alienated from his father and visibly conflicted about having a relationship with him." She asserted that Ms. McAllister had withdrawn Ian from the sessions even though she (the therapist) claimed to have observed progress. She recommended that the court order "reconciliation therapy" and expressed her skepticism that Ms. McAllister would consent (even though Ms. McAllister already had consented to reunification counseling with Dr. Sack).

Mr. McAllister's attorney had actually spoken with Ms. McClelland before the January 30, 2013, hearing, and had learned that she would not be able to testify on that date. He did not, however, apprise the master of her existence or of her opinions before resting his case, without reservation, at the end of the hearing on that day. Instead, after he had rested his case, he attempted to persuade the BIA to call Ms. McClelland.

The BIA, who had also spoken to Ms. McClelland before the hearing, initially took no position on whether Mr. McAllister could reopen his case and call Ms. McClelland. But when Mr. McAllister submitted a written motion to reopen the case, she opposed it (as did Ms. McAllister). On April 12, 2013, just before the hearing was to resume, the circuit court denied the motion to reopen and awarded attorneys' fees to Ms. McAllister.

### G.    Mr. McAllister's Motion to Strike the BIA

In the midst of the dispute about whether he could reopen his case, Mr. McAllister opened another front by moving to "strike" the BIA – *i.e.*, asking the court to disqualify his children's lawyer. His motion contained numerous arguments, including allegations

6

that the BIA had been incompetent in failing to "pinpoint" the reason why visitation was not occurring, that she had "concealed" Ms. McClelland's opinion regarding alienation, that she had engaged in "inexcusable delay" before making a recommendation regarding counseling, that she had incorrectly asserted a privilege as to the children's communication with a church-based counselor, and that she had exhibited "bias" in her cross-examination of Mr. McAllister at the first day of the hearing. The circuit court denied the motion and ordered Mr. McAllister to pay the resulting attorneys' fees and costs.

### H. The Conclusion of the Custody Hearing on April 15, 2013

Mr. McAllister's attorney arrived late, again, when the trial resumed on April 15, 2013. Once the proceedings were under way, Ms. McAllister presented her case, which included candid admissions that she had behaved poorly in the past. She claimed, however, that she now encouraged visitation and that Ian simply refused to cooperate. She also claimed that her ex-husband had exacerbated the tensions with his son by refusing to apologize for his conduct on the day of the arrest, among other things. Two witnesses corroborated Ms. McAllister's assertion that she urged her children, without success, to see their father.

Although Mr. McAllister's complaint had sought both legal and physical custody, he changed his position in closing argument by abandoning his request for physical custody, instead asking only for sole legal custody. Under his new position, his wife

would retain physical custody.

## I.     The Master's Report and Recommendation Regarding Custody

Four days later, on April 19, 2013, the master issued her report and recommendation regarding custody. The master's evenhanded findings assign blame to both parents, but effectively reject Mr. McAllister's contention that his ex-wife had alienated the children from him. The master specifically found "no evidence" that the lack of visitation after Mr. McAllister's arrest on April 14, 2012, "was [the] mother's doing." She also found that Mr. McAllister was too focused on professing his innocence to perceive how his children had perceived the events of that date.

The master emphatically rejected Mr. McAllister's belated assertion that he should have legal custody while his wife retained physical custody: it would be "a disaster for this family," she said. Particularly in a family that had experienced this level of discord, it would not benefit the children if the noncustodial parent had the legal power to control and direct the custodial parent's choices, the master found. Thus, the master recommended that the children receive counseling, but that physical and legal custody be undisturbed.

Finally, the master found that Mr. McAllister was in contempt because of his failure to pay $11,217.85 in alimony, child support, and childcare expenses after visitation had ceased in May 2012. At the same time, the master rejected Mr. McAllister's contempt allegations, finding that "it is Ian who is refusing to visit" and that

there was "no clear evidence" that Ms. McAllister had refused visitation.

### J. The Master's Report and Recommendation on Fees

At a hearing on June 5, 2013, the master considered the issue of the allocation of fees as between the parties, including the BIA's fees. On June 7, 2013, the master issued a report and recommendation on the subject of fees.

In that report, the master found that once the parties agreed to use Dr. Sack for reunification therapy for Mr. McAllister and Ian on January 30, 2013, Mr. McAllister lacked substantial justification to maintain the action. Hence, the master recommended that Mr. McAllister be required to pay all of the $8,515.00 in fees that his ex-wife had incurred after that date.

The master also recommended that the parties be required to split the remaining fees, including the BIA's fees, in proportion to their respective incomes (with Mr. McAllister paying 65 percent, and his ex-wife paying 35 percent). Because the parties, collectively, had incurred over $110,000.00 in fees, the recommendation would require Mr. McAllister to reimburse his wife for another $19,522.23 in fees (in addition to the $8,515.00 in fees that he was required to pay for maintaining the action without substantial justification after January 30, 2013).

Turning last to the BIA, the master expressly found that she "went the extra mile to try to understand the situation, the demeanor of the parties, the nature of the conflict, and the needs of her clients." The master went on to find that the BIA "did an excellent job

9

for the children, and went above and beyond what would be expected of a BIA." She

concluded by finding that the BIA's efforts were "appropriate" and that her bill was "fair

and reasonable." She recommended that Mr. McAllister be ordered to pay 65 percent of

the BIA's fee of $11,630.00.[3]

Mr. McAllister noted exceptions.

**K.      The Circuit Court's Rejection of the Exceptions**

On August 12, 2013, the circuit court held a hearing on Mr. McAllister's 27

exceptions. Four days thereafter, the court fully adopted the master's recommendations.

In particular, the court found Mr. McAllister in contempt for failing to pay alimony, child

support, and childcare expenses; allowed him to purge his contempt by paying the

$11,217.85 that the master found him to have withheld; rejected Mr. McAllister's

contempt allegations against his ex-wife; denied his request to modify custody; modified

visitation to permit Ian and his father to meet in supervised public places and to

participate in joint counseling with Dr. Sack (at Mr. McAllister's expense); and ordered

him to pay the attorneys' fees and expenses that the master had recommended. To date no

reunification counseling has taken place.

This timely appeal followed.

---

[3] During the hearing on June 5, 2013, Mr. McAllister attempted to call the BIA as a witness. The master correctly prohibited him from doing so, as the applicable guidelines state that a BIA should not testify at trial. *Maryland Guidelines for Practice for Court-Appointed Lawyers Representing Children in Cases Involving Child Custody or Child Access*, § 2.2.

## THE MOTION TO DISMISS THE APPEAL

Before we proceed to the substance of Mr. McAllister's appeal, we must first address a preliminary procedural matter: Ms. McAllister's motion to dismiss the appeal because of deficiencies in the record extract.

Consistent with the parties' general inability to cooperate or work constructively with one another, a dispute arose concerning the contents of the record extract. As the appellant, Mr. McAllister had the duty to prepare the record extract, Md. Rule 8-501(a), which began with the duty to designate those parts of the record that he proposed to include in the extract. Md. Rule 8-501(c)(1). But while Mr. McAllister's designations included large portions of the transcripts from the various hearings in the circuit court, he omitted other portions that apparently did not support his contentions or did not depict him in the best light.

Ms. McAllister responded by asking Mr. McAllister to include hundreds of additional transcript pages. Mr. McAllister replied that the additional pages were irrelevant and that his ex-wife had requested their inclusion simply to subject him to unnecessary burden and expense. Citing Md. Rule 8-501(d)(4), he took the position that he would include those pages in the record extract only if Ms. McAllister's attorneys supplied him with a certified check in the amount of $400.00, which he said represented

the projected cost of copying them.[4]

Ms. McAllister did not respond.  Instead, after Mr. McAllister filed a record extract that omitted the portions of the record that she had asked him to include, she exercised her right, under Rule 8-501(e), to file an appendix to her brief, which included 276 additional pages of pleadings and transcripts.  In addition, she moved to dismiss Mr. McAllister's appeal for noncompliance with Rule 8-501 or, in the alternative, to "correct the record."[5]

Having reviewed Ms. McAllister's brief and its many important citations to materials that appear only in her appendix, we agree that Mr. McAllister did not comply with his obligation to prepare a record extract that "contain[s] all parts of the record that

_____

[4] Rule 8-501(d)(4) states:

> If the appellant determines that a part of the record designated by the appellee is not material to the questions presented, the appellant may demand from appellee advance payment of the estimated cost of reproducing that part.  Unless the appellee pays for or secures that cost within five days after receiving the appellant's demand, the appellant may omit that part from the record extract but shall state in the record extract the reason for the omission.

Although Mr. McAllister omitted the portions of the record that his ex-wife had asked him to include, he did not comply with his obligation to "state in the record extract the reason for the omission." *Id.*

[5] The motion to "correct the record" is a misnomer.  Ms. McAllister does not contend that a portion of the official record has been omitted or that the record contains something that it ought not to contain.  *See* Md. Rule 8-414(b).  She complains that the record extract, which is supposed to be a digest of the record (*see* Md. Rule 8-501(c)), does not contain materials that it ought to contain.

are reasonably necessary for the determination of the questions presented by the appeal." Md. Rule 8-501(c). "Ordinarily," however, "an appeal will not be dismissed for failure to file a record extract in compliance with" Rule 8-501. Md. Rule 8-501(m); *accord Goldstein v. Miles*, 159 Md. App. 403, 420 (2004), *cert. denied*, 384 Md. 581 (2005); *Reed v. Baltimore Life Ins. Co.*, 127 Md. App. 536, 547 (1999).

For an appellate court, the "preferred alternative" is always "to reach a decision on the merits of the case." *Joseph v. Bozzuto Mgmt. Co.*, 173 Md. App. 305, 348 (2007). Consequently, this Court typically will not dismiss an appeal, even in the face of noncompliance with Rule 8-501, unless the appellee sustains prejudice. *Kemp-Pontiac Cadillac, Inc. v. S&M Constr. Co.*, 33 Md. App. 516, 524 (1976); *accord Joseph*, 173 Md. App. at 348; *see Reed*, 127 Md. App. at 547 (noting the absence of prejudice in declining to dismiss an appeal because of noncompliance with Rule 8-501).

Here, Ms. McAllister has eliminated any prejudice by diligently supplying the omitted material in the appendix to her brief. Accordingly, we shall not dismiss the appeal. We shall, however, "impose the cost of printing the omitted material on the appellant." *Kemp-Pontiac*, 33 Md. App. at 524; *accord Joseph*, 173 Md. App. at 348; *Reed*, 127 Md. App. at 547.[6]

_____

[6] By "omitted material," we mean the 276 pages of pleadings and transcripts that Ms. McAllister was required to include in her appendix. We do not mean the statutory materials that she would have been required to include even if Mr. McAllister had included the 276 pages of pleadings and transcripts in the record extract. *See* Md. Rule

(continued...)

13

Turning, at last, to the substance of the appeal, Mr. McAllister raises four issues, which we restate as follows:

1.     Did the trial court abuse its discretion in denying Mr. McAllister's motion to reopen his case-in-chief and for awarding attorney's fees to Ms. McAllister?

2.     Did the trial court abuse its discretion in denying Mr. McAllister's motion to strike the BIA for alleged inadequate representation of Ian, and for awarding attorney's fees to Ms. McAllister?

3.     Did the trial court abuse its discretion by limiting Mr. McAllister's time to present his case?

4.     Did the trial court err in overruling Mr. McAllister's exceptions to the master's recommendations regarding custody, visitation modification, contempt and attorney's fees?

For the reasons that follow, we answer in the negative and affirm each ruling.

## DISCUSSION

**A.     The Court Did Not Abuse Its Discretion in Denying the Motion to Reopen**

Mr. McAllister argues that the circuit court erred in denying his motion to reopen his case-in-chief so that he could call the social worker, Ms. McClelland, after he had rested without reservation at the end of the first day of trial on January 30, 2013.  We disagree.

---

[6] (...continued)
8-504(a)(8).  Nor do we mean the materials that relate only to her motion to dismiss – *i.e.*, the correspondence between counsel concerning the record extract.

Mr. McAllister correctly concedes that we must review the circuit court's ruling for abuse of discretion. Under that lenient standard, the ruling "will not be reversed simply because the appellate court would not have made the same ruling." *North v. North*, 102 Md. App. 1, 14 (1994). Instead, "[t]he decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable." *Id.*

We see no abuse of discretion in this case. Mr. McAllister demanded and received additional time to present his case (after arriving late for trial). The court allotted him an entire day, and he rested without reservation at the end of that day – at a time when he knew of the allegedly helpful opinions that Ms. McClelland would express. In fact, although he knew before the hearing that Ms. McClelland would be unable to attend that day, he did not bring her unavailability to the court's attention before resting his case. Nor did he bring her unavailability (or her potential testimony) to the BIA's attention (despite faulting her, later, for failing to call Ms. McClelland as a witness). In these circumstances, it might have been an abuse of discretion to permit Mr. McAllister to reopen his case.

In arguing for a contrary conclusion, Mr. McAllister relies heavily on *Flynn v. May*, 157 Md. App. 389 (2004). In *Flynn*, the trial court had issued a default judgment against the mother, a *pro se* litigant, denying her the ability to present her case on the merits because she had failed to follow the rules governing proper pleading. *Id.* at 393-

On appeal, this Court held that the trial court abused its discretion when it ordered a change in custody without permitting any witnesses to testify or other evidence to be offered. *Id.* at 411. We explained that, in light of the unrepresented litigant's relatively minor error and the paramount interest of the blameless child, the "dismissal of [the] petition – an extreme sanction – is well removed from any center mark we can imagine and beyond the fringe of what we deem minimally acceptable." *Id.* (quoting *Rolley v. Sanford*, 126 Md. 124, 131 (1999)).

We see no merit in Mr. McAllister's attempts to liken himself to the mother from *Flynn*, a *pro se* litigant whose procedural error caused her seven-year-old son to be "suddenly taken from his Mother, uprooted from his home, displaced from his neighborhood, and removed from his school." *Flynn*, 157 Md. App. at 411. Mr. McAllister was fully represented at all stages of trial, in which he called witnesses, offered his own testimony, presented nearly 20 exhibits, and closed his case without reservation. Far from having his case dismissed out of hand, he asked for and received extra time to argue his case. Although the interests of the child are ever paramount, we fail to see how a court's refusal to reopen Mr. McAllister's case, after the considerable leeway that it had already granted him, in any way ignores the child's interests.

In fact, the court had very good reason to deny the motion to reopen. The BIA, in her discretion, had declined to waive the privilege between Ms. McClelland and Ian (*see* Md. Code (2013 Repl. Vol.) § 9-109 of the Courts and Judicial Proceedings Article) and

16

had stated as much in opposing Mr. McAllister's motion to reopen his case. Thus, the court could not have allowed Ms. McClelland's testimony even if it had wished to do so. In any event, Ms. McClelland's testimony was unnecessary, because by the time of the motion to reopen, all parties already had agreed that reunification therapy was a shared goal.

In summary, the circuit court did not abuse its discretion. We thus affirm the court's denial of Mr. McAllister's motion to reopen his case to call Ms. McClelland.

**B.** **The Court Did Not Abuse Its Discretion in Denying Mr. McAllister's Motion to Strike the Best Interest Attorney**

Mr. McAllister next argues that the court abused its discretion in denying his motion to strike the BIA for alleged inadequate representation of Ian's best interests. For the reasons that follow, we affirm this ruling.

The concept of a BIA is a creation of statute. *See* Md. Code (2012 Repl. Vol.) § 1-202(a) of the Family Law Article. Section 1-202(a)(1)(ii) authorizes a court to appoint a BIA to represent a minor child "[i]n an action in which custody, visitation rights, or the amount of support of a minor child is contested." The BIA may not represent any other party to the action (*id.*) and must "exercise ordinary care and diligence in the representation of [the] minor child." *Id.*, § 1-202(b); *see Fox v. Wills*, 390 Md. 726 (2006) (rejecting the contention that BIAs have immunity from civil suit).

The essential characteristics of BIAs are outlined in the *Maryland Guidelines for Practice for Court-Appointed Lawyers Representing Children in Cases Involving Child*

17

*Custody or Child Access*, which the Court of Appeals adopted in 2007.  Section § 1.1 of

the *Guidelines* defines the term "BIA" and outlines the BIA's basic role:

> "Child's Best Interest Attorney" means a lawyer appointed by a court
> for the purpose of protecting a child's best interests, without being bound
> by the child's directives or objectives.  This term replaces the term
> "*guardian ad litem*."  The Child's Best Interest Attorney makes an
> independent assessment of what is in the child's best interest and advocates
> for that before the court, even if it requires the disclosure of confidential
> information.  The best interest attorney should ensure that the child's
> position is made a part of the record whether or not different from the
> position that the attorney advocates.

Similarly, § 2.2 of the Guidelines states that a BIA "advances a position that the

attorney believes is in the child's best interest."[7]

Because the BIA must advance a child's best interests in the midst of what are

often bitter and contentious disputes between the child's parents, the BIA will frequently

displease at least one, if not both, of the parties.  If a parent believes (in good faith) that

the BIA has injured the child through a breach of the standard of care, then he or she may

---

[7] A BIA's role differs from the related role of a "Child Advocate Attorney," in that
the Child Advocate Attorney "advances the child's wishes and desires in the pending
matter."  *Maryland Guidelines for Practice for Court-Appointed Lawyers Representing
Children in Cases Involving Child Custody or Child Access*, § 2.3.  In other words, the
Child Advocate Attorney does not make "an independent assessment of what is in the
child's best interest" and advocate that position "before the court" (*id.,* § 1.1), but rather
ascertains and advocates for the child's own "wishes and desires" (*id.*), much as an
attorney would do for a competent adult client.  The Child Advocate Attorney, however,
may advocate for the child's own wishes and desires only if he or she determines that the
child has "considered judgment."  *Id.*  If the child does not have considered judgment,
"the Child's Advocate Attorney should petition the court to (1) alter the attorney's role to
permit the attorney to serve as a Child's Best Interest Attorney or (2) appoint a separate
Child's Best Interest Attorney."  *Id.*

18

assert a claim for negligence on the child's behalf. Md. Code (2012 Repl. Vol.) § 1-202(b); *see Fox v. Wills*, 390 Md. at 634; *but see* Md. Rule 2-202(b) (granting a parent with sole custody the exclusive right to sue on the children's behalf for a period of one year following the accrual of any cause of action). If, however, a parent merely claims that a BIA should be disqualified from representing the child because the parent disapproves of the BIA's representation, it is appropriate for courts to view the claim with some measure of skepticism.

"When an opposing party moves for disqualification of the other party's counsel, the court will take a hard look at such a motion." *Klupt v. Krongard*, 126 Md. App. 179, 206, *cert. denied*, 355 Md. 612 (1999). As this Court has explained:

> The concern is that the opposing party will use such a motion to block, harass, or otherwise hinder the other party's case. Such 'tactical abuse' of the disqualification process is to be guarded against.

*Id.*; *accord Baltimore County v. Barnhart*, 201 Md. App. 682, 711 (2011) (quoting *Franklin v. Clark,* 454 F. Supp. 2d 356, 365 (D. Md. 2006) ("'Maryland courts are hesitant to grant disqualification motions, particularly where the opposing party is the sponsor of such a motion, because they can be abused for tactical reasons'")).

To guard against tactical abuse, "courts closely scrutinize such disqualification motions." *Klupt*, 126 Md. App. at 206; *Barnhart*, 201 Md. App. at 711. In cases like this, involving motions to disqualify BIAs, close scrutiny is particularly important because a parent might use the prospect of disqualification as a tactic to deter the BIA

from carrying out his or her duty to make "an independent assessment of what is in the child's best interest" and to advocate that position before the court. *Maryland Guidelines for Practice for Court-Appointed Lawyers Representing Children in Cases Involving Child Custody or Child Access*, § 1.1.

When a party moves to disqualify another person's attorney, as Mr. McAllister has done here, the moving party must first "identify a specific violation of a Rule of Professional Conduct," *Klupt*, 126 Md. App. at 203, such as a disabling conflict of interest. *Id.* at 205-10. Mr. McAllister, however, has identified no such ethical violation. Nor has he even identified a violation of the BIA Guidelines. Instead, he bases his case for disqualification solely on his vociferous disagreement with how the BIA opted to conduct her representation of the McAllister children, including his disagreement with the allegedly "biased" manner in which the BIA conducted her cross-examination of him.

The short answer to Mr. McAllister's contention is that he does not have the right to disqualify another person's lawyer merely because he disagrees with the strategy and tactics that the lawyer has employed. A more complete answer is that the master reviewed the BIA's conduct in this case and had nothing but praise, finding that she "did an excellent job for the children, and went above and beyond what would be expected of a BIA." Because there is no basis to conclude that that finding is clearly erroneous, the

20

court did not err in denying the motion to strike the BIA.[8]

## C. The Trial Court Did Not Arbitrarily Limit Mr. McAllister's Time to Present His Case

The master granted Mr. McAllister's request for additional time to present his case. Mr. McAllister then took a full day to present his case, pushing back Ms. McAllister's and the BIA's respective cases until a later date. He finished by resting his case without reservation on any issue. At the close of the proceedings, Mr. McAllister asked for and was denied additional time to present rebuttal evidence. The circuit court later rejected Mr. McAllister's exception to that decision. Mr. McAllister now asserts that the court erred in doing so, thus allegedly denying him his due process rights under the Fifth and Fourteenth Amendments to the U.S. Constitution.

We reject Mr. McAllister's attempt to conjure a constitutional violation out of a routine, discretionary ruling regarding the order of proof at trial. The master gave Mr. McAllister more than an ample amount of time to present all facets of his case. Yet, not only did Mr. McAllister's counsel arrive late on both trial days, but he failed to make a timely request to set aside some of his time for rebuttal purposes. As the circuit court

---

[8] Just as Mr. McAllister attempts to transform routine procedural rulings into constitutional violations, he argues that his constitutional rights as a parent vest him with a special right to challenge the conduct of his children's attorney. But because his wife has the same constitutional rights that he has, she too would presumably have a comparable right to challenge the BIA's conduct. Thus, under Mr. McAllister's view, one parent could challenge the BIA for being too aggressive in her examination of him, while the other parent could challenge the BIA for not being aggressive enough. Because Mr. McAllister's position leads to these absurd consequences, it must be wrong.

21

observed in overruling his exception, "[Mr. McAllister's] argument has been hindered and that has not been due to the court's actions. It's just due to him. Failure to allot time accordingly."

The trial court here did not abuse its broad discretion. Indeed, in view of the master's well-supported finding that Mr. McAllister lacked substantial justification to maintain the action after the first day of trial, when his ex-wife formally agreed to his request for reunification therapy with Dr. Sack, the court could not conceivably have abused its discretion by precluding him from unnecessarily prolonging the proceedings even further. The court certainly has not failed to afford him due process, which assures reasonable procedural protections appropriate to the fair determination of the issues presented, but does not require that a litigant be satisfied with the result. *Wagner v. Wagner*, 109 Md. App. 1, 23, 24 (1996), *cert denied*, 343 Md. 334 (1996). While Mr. McAllister might have misunderstood that the master was giving him a specific amount of time to put on his entire case (and not just his case-in-chief), the misunderstanding does not give rise to an abuse of discretion. Accordingly, we reject his challenge to the decision not to allow him to present a rebuttal case.[9]

---

[9] It is not entirely clear why Mr. McAllister actually needed a rebuttal case. He claims to have wanted to counter his ex-wife's testimony that he failed to attend Ian's fifth-grade graduation in May 2012 by establishing that he was prohibited from attending by the temporary protective order that she had obtained. Presumably, however, he could have elicited that fact while cross-examining her. Alternatively, he could have asked the court to take judicial notice of the protective order.

**D.** **The Trial Court Did Not Abuse Its Discretion in Its Independent Review of Mr. McAllister's Exceptions**

Lastly, Mr. McAllister argues that the trial court erred by failing to exercise "proper independent judgment" in denying his 27 exceptions to the master's findings and recommendations. Again, we disagree.

When reviewing a master's report, both a trial court and an appellate court defer to the master's first-level findings (regarding credibility and the like) unless they are clearly erroneous. *In re Priscilla B.*, 214 Md. App. 600, 623-24 (2013). On the other hand, the reviewing courts give less deference to "conclusory or dispositional" findings, *id.* at 624; *Wenger v. Wenger*, 42 Md. App. 596, 607 (1979); such as the master's findings, in this case, that Mr. McAllister lacked substantial justification to maintain the custody action after the first day of trial or that it "would be a disaster" for one parent to have legal custody and the other to have physical custody. *See Wenger*, 42 Md. App. at 607. Finally, while the circuit court may be "guided" by the master's recommendation, the court must make its own independent decision as to the ultimate disposition, *Priscilla B.*, 214 Md. App. at 623; *Wenger*, 42 Md. App. at 604-05; which the appellate court reviews for abuse of discretion. *Domingues v. Johnson*, 323 Md. 486, 492 (1991).

Mr. McAllister argues that the trial court abused its discretion in its review of the record – allegedly accepting the master's recommendations without scrutiny, while "fail[ing] to grasp that Ms. McAllister has poisoned Ian" or that "Ian has adopted his mother's views regarding his father and internalized those views as his own." Mr.

23

McAllister separately asserts that the trial court failed to provide any independent analysis in reaching its conclusions.

This argument has no basis. The lengthy transcript reveals the circuit court's painstakingly thorough review of Mr. McAllister's several dozen, scattershot exceptions. We need go no further than to state that the court reviewed each exception and provided a cogent and incisive rationale for each of the conclusions it reached. Indeed, because Mr. McAllister failed to set forth his exceptions with particularity, the court recognized that it could have deemed them to have been waived (Md. Rule 9-208), but it considered them anyway. Moreover, the court actually accepted at least one of Mr. McAllister's allegations of error,[10] but concluded that he suffered no prejudice – which he does not challenge on this appeal.

In short, the court continually gave an ample basis for supporting the master's decision to reach conclusions contrary to Mr. McAllister's wishes. Most notably, the court stated that the "exceptions echo[] the underlying issue that [Mr. McAllister] fails to take any personal responsibility for the deterioration of the relationship with Ian." Similarly, the court stated that, in blaming his ex-wife for the lack of visitation, "[Mr. McAllister] fails to acknowledge the feelings of Ian in this situation and the rational

---

[10] The master erroneously permitted the BIA to assert the children's privilege not to disclose communications with psychiatrists and psychologists (Md. Code (2013 Repl. Vol.) § 9-109 of the Courts and Judicial Proceedings Article) even as to a counselor who was not a licensed psychologist or psychiatrist.

feelings he may be experiencing about his father as a cause of why [Ian] does not want to spend time with him." Because the court thus exercised its independent judgment in reviewing the record and reaching its conclusions, we see no abuse of discretion.[11]

## CONCLUSION

For the foregoing reasons, we affirm each of the judgment in Ms. McAllister's favor.

> **JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY AFFIRMED. COSTS, INCLUDING THE COST OF PREPARING 276 PAGES OF APPELLEE'S APPENDIX, TO BE PAID BY APPELLANT.**

---

[11] Separately, Mr. McAllister argues that the court erred in awarding attorney fees to Ms. McAllister for the trouble of contesting both the motion to reopen and the motion to strike the BIA. In light of our conclusion that the court did not err in denying those motions, we see no error in the award of fees.